UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CHASE BAILEY,

      Plaintiff,

v.                                                                    CASE NO. 3:25-cv-173-MCR-HTC

CHIP SIMMONS, et al.,

      Defendants.

_____/

## ORDER

Plaintiff Chase Bailey filed this civil rights lawsuit against Defendants Sergeant Jake Bandurski and Sheriff Chip Simmons of the Escambia County Sheriff's Office for Fourth and Fourteenth Amendment violations under 42 U.S.C. § 1983, and for battery, negligence, and negligent supervision under Florida law. Defendants move to dismiss Bailey's Amended Complaint for failure to state a claim, qualified immunity, and state sovereign immunity. After fully considering the Parties' arguments, Defendants' motion will be granted.[1]

---

[1] In moving to dismiss, Defendants attach body camera footage and 911 calls. This evidence has been considered because it is central to Bailey's claims and its authenticity is not disputed. *See Swinford v. Santos*, 121 F.4th 179, 187-88 (11th Cir. 2024) ("a district court may consider evidence attached to a motion to dismiss" if it is: (1) central to the plaintiff's claims, depicting the underlying events; and (2) its authenticity is not disputed). While Bailey argues that the evidence cannot be considered because it is open to interpretation and requires inappropriate fact finding, the Eleventh Circuit has rejected similar arguments. *Baker v. City of Madison, Ala.*, 67 F.4th 1268, 1277-78 (11th Cir. 2023). Per *Baker*, this Court credits Bailey's well-pled factual allegations as true unless obviously contradicted by the body camera footage or 911 calls. *Id.* (courts need not rely on "visible fiction").

### I.   Background[2]

On March 20, 2023, Bailey was in "a mental health crisis."  ECF No. 19 at ¶9.  His girlfriend of three years had broken up with him, and he risked losing his job.  *Id.*  Deputies Bandurski, Franklin, and Brock of the Escambia County Sheriff's Office were dispatched to Bailey's apartment that day after his roommates, William Marshall and Nick Scott, called 911.  ECF Nos. 24-1, 24-2, 24-3, 24-4.

On the call, Marshall reported that Bailey had a gun and is "trying to kill me and my roommate [Scott]."  ECF No. 24-1.  Marshall locked himself in his bedroom, and he reported to dispatch that he heard clicking noises—"I think he's loading something."  *Id.*  Marshall further reported that Bailey was "trying to get into [Scott's] room" and was saying it was all "a joke."  *Id.*; ECF No. 24-2 (Marshall reporting, "[Bailey] is talking about it's a joke -- it's a joke -- but I'm not going out [of my room] . . . my roommate is screaming he has" a gun).  Marshall also told dispatch that Bailey was drinking, and Marshall did not know if the gun was real.  *Id.*

While Marshall was on the phone, Scott also called 911.  Scott reported that Bailey is bipolar and "pulled a gun on me."  ECF No. 24-3.  And while on the phone, Scott tried barricading himself in his bathroom.  *Id.*  ("He pointed a gun right at my

---

[2] Citations to ECF No. 19 are to Bailey's Amended Complaint, and citations to ECF No. 24 are to the video evidence and 911 calls.

head. Oh God. . . . I don't have much to barricade with. . . . He's walking around [the apartment], I don't know if the gun is real or fake. . . . For me it's real, he's point[ed] it at my head."). Scott further informed dispatch that Bailey was "threatening -- saying he's going to kill himself," and Scott also said that he received a text from Bailey's mother saying that Bailey is suicidal. *Id.*[3] Dispatch relayed the information from Marshall and Scott's 911 calls to the deputies while they were *en route* to Bailey's apartment. ECF No. 24-6 (dispatch relaying over the deputies' radios that Bailey "pulled a gun," was "threatening to kill himself," was "drinking," and that the gun may or may not be real).

Deputies Franklin, Brock, and Bandurski arrived at Bailey's apartment at approximately 11:15:00 a.m.[4] ECF No. 24-5. The deputies lined up in a tight single-line, three-man formation outside of the front door of the apartment with Deputy Franklin leading the formation and holding a riot shield, and Deputies Brock and Bandurski directly behind him. *Id.* Deputy Franklin knocked loudly on the front door, and after hearing no answer he opened the door and entered the apartment. *Id.* Deputies Brock and Bandurski followed immediately behind. *Id.*

---

[3] Marshall and Scott remained on the phone with 911 while locked in their rooms. *See* ECF Nos. 24-1, 24-2, 24-3, 24-4.

[4] The 911 calls do not contain timestamps, and it is unclear how much time elapsed between when the 911 calls were placed and when the deputies arrived. However, it appears the deputies likely arrived roughly 10 minutes after Marshall's 911 call. ECF Nos. 24-1, 24-2.

On entering, Deputy Franklin announced, "Sheriff's Office, make yourself be known!" *Id.* He took a few steps forward toward the communal living room in the center of the apartment, and he then peered around the corner of a hallway to his left, announcing "Sheriff's Office! Hey Chase! Open the door!" ECF No. 24-5.[5] For the rest of the time in question (11:15:30 a.m.-11:19:30 a.m.), the deputies generally stood in a tight, single-line three-man formation at the corner of the left-hand hallway—peering down the hallway. *Id.* And for two minutes (between roughly 11:15:30 a.m. and 11:17:30 a.m.), the deputies called out to Bailey from the corner of the left-hand hallway but received no response. ECF No. 24-5 (Franklin announcing in intervals during this timeframe: "Chase! This is the Sheriff's Office! If you can hear me, open up the door!"; "Hey Chase! This is the Sheriff's Office! Open up the door if you can hear me!"; "Chase! Come on out! If you have any weapons on you put them down! Come on out with your hands up!"; "Hey Chase! Come on out! Come out with your hands up! We just want to talk, alright!"; "Hey Chase! This is the Sheriff's Office! Need you to open the door so we can talk!").

At approximately 11:17:30 a.m., a fourth deputy arrived on scene and located a gun on a table in the center of the apartment, but at the time he gave no indication

---

[5] While the deputies knew that Bailey's unit, or room, was at the end of the hallway and that he might have been in there, they had also been told by dispatch that he might be walking around the apartment. *See generally* ECF Nos. 24-1, 24-2, 24-3, 24-4; ECF No. 24-6 (dispatch relaying over the deputies' radios that Bailey was in his unit "A" or walking around the apartment).

of whether the gun was real or fake.  ECF No. 24-7.  Notwithstanding, even if that gun was fake and the deputies knew it was fake, that does not mean they knew no other gun was present, particularly given that Bailey was behind closed doors.  *Cf. Cunningham v. Cobb Cnty., Ga.*, 141 F.4th 1201, 1211 (11th Cir. 2025) (discussing that simply because an officer did not find a weapon on the suspect's person "does not mean that, from their perspective, they knew he did not have one on him").[6]

At 11:17:39 a.m., Bailey responded to the deputies for the first time, from behind the closed door, stating—"I'm gonna kill myself."  ECF No. 24-5.[7]  Deputy Franklin said, "No! Just relax, we just want to talk alright," Bailey replied, "Don't touch the door. Don't fucking touch it," and Deputy Brock said, "We're not."  *Id.* at 11:17:39-11:17:54.  Bailey then opened the door on his own, Deputy Franklin announced "Chase! Put your hands up! Just show me your hands!," and Deputy Bandurski said "Chase, talk to me, tell me what's going on."  *Id.* at 11:17:56-11:18:05.

---

[6] Bailey alleges that, "[u]pon the arrival of three officers at the residence at 11:16 a.m. . . . [they] determined that the weapon Mr. Bailey alleged to have was fake."  *See* ECF No. 19 at ¶8.  Not so. The three deputies did not confirm that the gun located on the table was fake, but even more importantly, Deputy Bandurski, who fired the taser shot, only identified the gun as fake *after* Bailey was ultimately subdued.

[7] At 11:17:30 a.m., Bailey appears to have loudly mumbled something from behind the closed door.  ECF No. 24-5.  However, his words are undiscernible.  The first time Bailey says anything discernable is at 11:17:39 a.m., when he says "I'm gonna kill myself."

Bailey immediately closed the door.  *Id.* at 11:18:05.  The following back-and-forth conversation occurred between Deputy Bandurski and Bailey, while Bailey was behind the closed door and Deputy Bandurski remained in-formation at the corner of the left-hand hallway.  *Id.* at 11:18:09-11:19:05.

- Bandurski: "Just talk to us man, what's going on today?"
- Bailey: "I don't want to hurt you."
- Bandurski: "I don't want to hurt you either man, tell me what's going on?"
- Bailey: "I only want to hurt myself."
- Bandurski: "We don't want you to hurt yourself [] Chase, just tell me what's going on man."
- Bailey: "I'm gonna be dead."
- Bandurski: "We don't want that. What's going on Chase? Can you come out? Can I see your face? Can I talk to you? Chase, tell me what's -- we just want to help you out man.  We don't want you to hurt yourself, but I need you to talk to me. Can you tell me what's going on?"
- Bailey: [Mumbled and incomprehensible speech].
- Bandurski: "Chase tell me what's going on, what's happening today? Chase, I can't hear you man through the door can you open up the—"
- Bailey: (interrupts Bandurski, yelling) "I need to speak with my mom!"
- Bandurski: "You miss you mom?"

Bailey then opened the door, threw an unidentifiable object down the hallway towards the deputies, which impacted either the wall or the floor, making a loud noise.  *Id.* at 11:19:09-12.[8]  Bailey and Deputy Bandurski continued their back-and forth conversation, with Bailey still behind the closed door.  *Id.* at 11:19:12-11:19:35.

---

[8] The body camera footage does not show the object being thrown; yet Bailey does not dispute that he threw an object down the hallway towards the deputies.  The deputies later commented that the object might have been a "vape" and appeared to have "exploded," but the video does not show what it was or whether it exploded.

- <u>Bandurski</u>: "He threw something, we're good."
- <u>Bailey</u>: "Give my voice [incomprehensible speech] to my mom."
- <u>Bandurski</u>: "Can you tell me one more time Chase, I didn't hear you. Where's you mom at?"
- <u>Bailey</u>: "Give my voice [incomprehensible speech] to my mom."
- <u>Bandurski</u>: "Where's your mom at?"

Bailey then opened the door and stepped into the hallway, at which point Deputy Bandurski immediately fired a single taser shot directly at Bailey's torso. *Id.*; ECF No. 24-7. Bailey's hands were not raised in the air as Deputy Franklin had commanded, but he was not holding a gun. *Id.* Bailey does not dispute that Deputy Bandurski deployed the taser immediately after he opened the door. ECF No. 31.

The single taser shot hit Bailey in his torso and penis, at which point he fell to the floor on his side, with his left-shoulder and the left-side of his torso making contact with the floor first and the left-side of his head making contact with the floor next. ECF No. 19 at 5, 7; ECF No. 24-7 at 11:20:21-23; 11:45:21. Bailey then lost consciousness "intermittently" and suffered a "significant" nosebleed. ECF No. 19 at ¶14. He briefly foamed at the mouth and had difficulty breathing. ECF No. 24-6. The deputies monitored him closely, checking his condition and watching his breaching, which soon returned to normal. *Id.* EMS arrived shortly thereafter and took him to the hospital at roughly 11:50:00 a.m. *Id.* Also, shortly after Bailey was shot with the taser Deputies Brock and Bandurski confirmed that the gun found earlier on the table was an airsoft gun. *Id.*

CASE NO. 3:25-cv-173-MCR-HTC

Bailey alleges he suffered a "left frontal temporal contusion (brain bleed), moderate traumatic brain injury (TBI), focal motor seizures, hemiparesis, [and] neuropathic pain," and as a result he was hospitalized for approximately two months and spent a week in a rehabilitation facility. ECF No. 19 at ¶16. He claims he is permanently disabled. *Id.* Also, according to Bailey, the day after the tasing Deputy Bandurski revised his initial Use of Force Report, falsely stating that Bailey was actively resisting or evading arrest, thereby portraying Bailey as the aggressor. *Id.* at ¶22.

## II.    Discussion

A complaint must contain sufficient factual matter that, taken as true, states a facially plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also* Fed. R. Civ. P. 12(b)(6) (a complaint that fails to state a claim is subject to dismissal). Facially plausibility arises "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements," conclusory statements, labels or mere legal conclusions are not entitled to a presumption of truth and are insufficient to state a claim. *Id.*; *see also Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004).

Additionally, as discussed *supra* note 1, the Court credits Bailey's factual allegations as true to the extent not "obviously contradicted" by the video evidence. *Baker*, 67 F.4th at 1277-78.

### A.    Excessive Force and Battery

Defendants raise the defense of qualified immunity to Bailey's excessive force claim under the Fourth Amendment and also argue that his battery claim fails under Florida law.

Qualified immunity shields governmental officials, who perform discretionary functions, from civil liability if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (internal citations omitted). To invoke the defense of qualified immunity, "a government official must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016) (citing *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).

Because Bailey does not dispute that Deputy Bandurski was acting within the scope of his discretionary authority when he deployed the taser, the burden therefore shifts to Bailey to show that qualified immunity does not apply. *Edwards v. Grubbs*, ---F.4th---, 2026 WL 706637, at *4 (11th Cir. Mar. 13, 2026) (Because "Mr. Edwards does not dispute that Officer Grubbs was acting within the scope of his discretionary

authority when he discharged his taser," the "burden therefore shifts to Mr. Edwards to establish that qualified immunity does not apply" (citing *Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019) (police officers act within their discretionary authority when they are "on duty . . . conducting arrest and investigative functions"))). Accordingly, Bailey must show that Deputy Bandurski (1) violated his constitutional rights, (2) and that it was "clearly established" by the law at the time that Deputy Bandurski's conduct would violate Bailey's constitutional rights. *Id.* (internal quotations omitted).

The standard of "objective reasonableness" governs whether an officer has used excessive force in violation of the Fourth Amendment. *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989) and *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (internal citations and quotations omitted); *see also id.* at 397 ("the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation" (internal quotations omitted)). The Eleventh Circuit has identified the following six factors for courts to consider when evaluating an officer's use of force: (1) the severity of the crime, (2) an immediate threat of harm, (3) active resistance, (4) the need for force, (5) the relationship between the need for

force and the force used, and (6) the injuries inflicted. *Edwards*, 2026 WL 706637, at *5 (citing *Wade v. Daniels*, 36 F.4th 1318, 1325 (11th Cir. 2022)). Applying them, the Court finds that Deputy Bandurski's deployment of a single taser shot was objectively reasonable.

First, from the deputies' perspective based on what they knew at the time, Bailey's conduct constituted aggravated assault, which is a serious violent crime.[9] Bailey disputes that he committed a violent crime and instead suggests that at most he committed the crime of "false reports." This argument ignores two key points. First, the Court looks to the severity of the crime based on the facts known to law enforcement at the time, not what the facts may later turn out to show. Also, even if the gun was ultimately determined to be an airsoft gun as opposed to a firearm, it was reasonable under the circumstances for the officers to be concerned about a firearm.[10]

Second, Bailey posed a threat of harm to the deputies and himself. *Edwards*, 2026 WL 706637, at *6 (citing *Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005) (also considering the extent to which the suspect poses a threat to himself)). Bailey admits he was in a mental health crisis and the deputies knew it.

---

[9] While the deputies later learned that the alleged gun was an airsoft gun, the deputies operated under the reasonable assumption that Bailey may have possessed a real gun.

[10] Even assuming *arguendo* that his roommates made false reports, Bailey has never alleged or argued that the deputies knew the reports were false.

Bailey stated to the deputies from behind a closed door—with an alleged gun—"I'm gonna kill myself," "I only want to hurt myself," and "I'm gonna be dead." ECF No. 24-5. His behavior was clearly erratic, given that he immediately closed the door after Deputy Franklin yelled, "Put your hands up!" He also oscillated between yelling and mumbled speech, and he threw an object down the hallway towards the deputies. And while Bailey told the deputies "I don't want to hurt you," his action of throwing an object down the hallway reasonably showed otherwise. Given his erratic and unpredictable behavior, the deputies did not need to take Bailey at his word.

Third, Bailey resisted the deputies' lawful commands to exit the room with his hands raised. He initially passively resisted by staying in the room rather than exiting as the deputies ordered. *Jones v. Michael*, 656 F. App'x 923, 931 (11th Cir. 2016) (non-compliance with police commands is still "resistance" because it is "passive resistance"); *Charles v. Johnson*, 18 F.4th 686, 701 (11th Cir. 2021) (considering that the suspect resisted because he "ignored twenty-one commands from the officers"). Bailey also actively resisted once he opened the door, Deputy Franklin yelled "Put your hands up!," and instead he closed the door. ECF No. 24-5; *Johnson*, 18 F.4th at 701 (considering that the suspect resisted because he "navigated his arms and body away" to avoid being taken into custody). And his act

CASE NO. 3:25-cv-173-MCR-HTC

of throwing an object down the hallway towards the deputies further shows active resistance.

Fourth, Bailey's non-compliance with the deputies' commands and expressions of suicidal intent—with an alleged gun, from behind a closed door—supported a reasonable belief that there was a need for force. *See Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (finding uncooperative behavior and repeated failures to comply with an officer's commands during "difficult, tense, and uncertain situation[s]" demonstrates a "reasonable need for some use of force"); *Duncan v. Wade*, 851 F. App'x 959, 962 (11th Cir. 2021) ("Deputy Ward acted reasonably when he used force against Duncan after she did not obey his [prior] orders to get on the ground. . . . Acting under a reasonable[] belief that Duncan had heard his instruction after Deputy Ward gave it three times, Deputy Ward was not required to 'wait and hope for the best' before making the split-second decision to tase Duncan.").[11]

Fifth, a single taser shot was proportional to the need to subdue Bailey and avoid further escalation of an already tense and difficult situation. *Draper*, 369 F.3d at 1278 (finding a single taser shot reasonably proportionate to the need to subdue individual who repeatedly failed to comply with an officer's commands and

---

[11] This is not a situation where Deputy Bandurski fired a taser despite seeing that Bailey was non-threatening and compliant for several moments after he exited the room.

demonstrated uncooperative behavior during a "difficult, tense, and uncertain situation"); *Duncan*, 851 F. App'x at 962 (finding use of taser reasonable to prevent further escalation and injury even though the defendant was not resisting at the moment).[12]

Sixth, although Bailey suffered significant injuries, the severity of his injuries (e.g., a two-month stay in the hospital) was not reasonably foreseeable from a single taser shot with a fall to the floor. Bailey was not shot in the head with the taser. *Cf. Mercado*, 407 F.3d at 1160-61. He also was not shot while standing at an elevated height.[13] *See Edwards*, 2026 WL 706637, at *5 (finding an officer's single taser shot at a suspect's back was deadly force because, when shot, the suspect was "in a vulnerable and dangerous elevated position" as he ran down "a steep embankment"). Although it may have been reasonably foreseeable that a single taser shot would cause someone to fall to the floor, the severe injuries Bailey suffered were not reasonably foreseeable. *See Rodriguez v. Farrell*, 280 F.3d 1341, 1352-53, n.19 (11th Cir. 2002) (finding handcuffing an individual, which is not typically excessive

---

[12] Bailey briefly argues that Deputy Bandurski's failure to comply with Fla. Stat. § 943.1717, which governs the use of a taser gun, shows that Deputy Bandurski did not need to deploy his taser gun under these circumstances. *See* ECF No. 31 at 24. Yet Deputy Bandurski's compliance or non-compliance with this statute is entirely independent from whether he violated the Fourth Amendment, which is the subject of the instant inquiry. *Webster v. Fredricksen*, 2019 WL 1765069, at *2 (M.D. Fla. Apr. 22, 2019) (refusing to rely on Fla. Stat. § 943.1717 in determining whether an officer used excessive force under the Fourth Amendment).

[13] From the video, it is clear that nothing on the floor beneath Bailey when he fell could have caused harm.

force but ultimately led to the loss of an arm, had not caused a reasonably foreseeable injury); *see also id.* at 1353 ("We do not use hindsight to judge the acts of police officers; we look at what they knew (or reasonably should have known) at the time of the act.").

On balance, the Court finds that Deputy Bandurski did not violate the Fourth Amendment when he tased Bailey. As a result, Bailey's state-law battery claim also fails. *Andrews v. Marshall*, 845 F. App'x 849, 856 (11th Cir. 2021) ("Ms. Andrews's state law assault and battery claims fail for the same reason her excessive force claim fails.").[14]

### B.     Negligence[15]

Bailey further claims that Deputy Bandurski was negligent by failing to contact a crisis intervention team and failing to have him Baker Acted. To state a

---

[14] Because Bailey has not shown a constitutional violation, the Court need not analyze whether it was "clearly established" on March 20, 2023, that the alleged conduct violated a constitutional right. *See Edwards*, 2026 WL 706637, at *4. Also, in his Amended Complaint Bailey alleged several specific statements that the deputies made after the tasing in an effort to show that the tasing was in bad-faith or otherwise wanton and willful. *See generally* ECF No. 19. But these statements have no bearing on whether excessive force was used. *See Graham*, 490 U.S. at 397 ("the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation" (internal quotations omitted)).

[15] Bailey also asserts a *Monell* claim, however, without an underlying constitutional violation his *Monell* claim necessarily fails. *Cunningham v. Cobb Cnty., Ga.*, 141 F.4th 1201, 1231 (11th Cir. 2025) ("In our analysis of Cunningham's excessive force claim against the Defendant Officers, we concluded that the Officers did not violate Cunningham's Fourth Amendment rights. Because we have already ruled that the Defendant Officers did not deprive Cunningham of his constitutional rights, we need not consider whether Cobb County had an official policy that caused a violation. Cunningham's *Monell* claim simply fails as a matter of law.").

claim for negligence under Florida law, the plaintiff must allege facts plausibly showing that: (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached this duty of care; and (3) the breach caused damages. *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1262 (11th Cir. 2001) (internal citations omitted). Defendants argue that Deputy Bandurski did not owe Bailey a duty of care. In response, Bailey argues that he was owed a duty of care pursuant to the undertaker's doctrine and also because Deputy Bandurski placed him in a zone of risk.[16]

"Establishing the existence of a duty under Florida's negligence law is a minimum threshold legal requirement that opens the courthouse doors, and is ultimately a question of law for the court rather than a jury." *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1339 (11th Cir. 2012) (internal citations omitted and alterations in original adopted). The Florida Supreme Court has outlined four general categories of governmental activities that either support or fail to support the imposition of a duty:

> (I) legislative, permitting, licensing, and executive officer functions; (II) enforcement of laws and the protection of public safety; (III) capital improvements and property control operations; and (IV) providing professional, educational, and general services for the health and welfare of the citizens.

---

[16] Bailey further claims that Deputy Bandurski owed a duty of care because he and Deputy Bandurski had a "special relationship." ECF No. 19 at ¶33. The Court disagrees. There was plainly no "special relationship." *Pierre v. Jenne*, 795 So. 2d 1062, 1064 (Fla. 4th DCA 2001) (a special relationship exists if law enforcement makes a promise or assurance, the victim justifiably relied on the promise or assurance, and as a result suffered harm). Deputy Bandurski never made any kind of promise to Bailey.

CASE NO. 3:25-cv-173-MCR-HTC

*Wallace v. Dean*, 3 So. 3d 1035, 1047 (Fla. 2009) (quoting *Trianon v. City of Hialeah*, 468 So. 2d 912, 919 (Fla. 1985)).  Generally, officers engaged in category I and II activities do not owe an individualized duty of care, and thus, category I and II activities typically do not give rise to a negligence claim.  *Id.*; *Anderson v. Snyder*, 389 F. Supp. 3d 1082, 1091 (S.D. Fla. 2019) ("governmental activities within Categories I and II are owed to the public at large, rather than to individual citizens," and thus officers engaging in these activities are "generally immune from tort liability" (citing *Wallace*, 3 So. 3d at 1047)).  However, officers engaged in category III and IV activities "may subject the State to substantial governmental liability based upon traditional principles of tort law."  *Wallace*, 3 So. 3d at 1049 (internal quotations omitted).

This case implicates category II as Deputy Bandurski was enforcing the laws and protecting the public's safety.  *See Greer v. Ivey*, 767 F. App'x 706, 713 (11th Cir. 2019) (finding that officers responding to emergency 911 calls for help were engaged in Category II law enforcement activity).  Although Bailey claims that Deputy Bandurski had a duty based on the undertaker's doctrine, which concerns a duty created when an officer specifically undertakes to provide care, the undertaker's doctrine does not apply to officers engaged in category II activities.  *See Wallace*, 3 So. 3d at 1049 (discussing that the undertaker's doctrine applies to category III and IV activities); *Greer v. Ivey*, 242 F. Supp. 3d 1284, 1300 (M.D. Fla. 2019) (finding

that officers engaged in category II activities did not have a duty based on the undertaker's doctrine (citing *Wallace*, 3 So. 3d at 1049)), *affirmed and reversed in part on other grounds*, 767 F. App'x 706.

Although Deputy Bandurski did not have a duty to Bailey under the undertaker's doctrine, he nonetheless may have owed a Bailey duty of care if he had placed him in a "zone of risk." *Wallace*, 3 So. 3d at 1048 ("A special tort duty arises when law enforcement officers become directly involved in circumstances which place people within a 'zone of risk' (1) by creating or permitting dangers to exist, (2) by taking persons into police custody, (3) detaining them, or (4) otherwise subjecting them to danger."  (internal citations and emphasis omitted, alterations adopted in original)).  Deputy Bandurski did not detain Bailey or take him into custody and did not create or permit a danger to exist or otherwise subject Bailey to danger.[17]  *Lugo v. Simmons*, 760 F. Supp. 3d 1344, 1359 (N.D. Fla. 2024) (finding deputies placed the plaintiff within a zone of risk "when they took him into custody and kept him restrained in the footwell of the car while he struggled to breathe"); *Guillermo v. United States*, 2026 WL 642365, at *11 (M.D. Fla. 2026) (finding ICE placed the plaintiff within a zone of risk when he was detained and subsequently put "in solitary confinement without required safeguards"), *report and recommendation adopted*,

---

[17] Indeed, Deputy Bandurski did not act proactively by, for example, busting down the door of Bailey's room, which may have placed Bailey in a zone of risk.

2026 WL 642366. Because Deputy Bandurski did not place Bailey in the zone of risk and did not have a duty pursuant to the undertaker's doctrine, Bailey's negligence claim fails.

### C. Negligent Supervision

Lastly, Bailey claims that Sheriff Simmons negligently supervised Deputy Bandurski, who allegedly changed and falsified his Use of Force report the day after the tasing. To state a claim for negligent supervision under Florida law, a plaintiff must allege facts plausibly showing that: (1) an employer had "actual or constructive notice of an employee's unfitness"; and (2) the employer unreasonably failed to investigate their employee and take corrective action. *Dep't of Env't Prot. v. Hardy*, 907 So. 2d 655, 660 (Fla. 5th DCA 2005); *see also Erickson v. Manatee Cnty. Sheriff's Dep't*, 824 F. App'x 861, 865 (11th Cir. 2020) (citing *Hardy*, 907 So. 2d at 660). Defendants argue that Bailey has failed to allege facts showing that Sheriff Simmons had actual or constructive knowledge of Deputy Bandurski's unfitness, and the Court entirely agrees. *Inman v. Am. Paramount Fin.*, 517 F. App'x 744, 748 (11th Cir. 2013) (affirming dismissal of negligent supervision claim for lack of factual allegations showing the defendant "was aware or should have been aware that [their employee] was predisposed to committing the wrongs alleged").[18]

---

[18] Bailey's arguments to the contrary are unavailing. According to Bailey, Sheriff Simmons failed to maintain adequate policies regarding taser use, failed to ensure that deputies complied with existing statutory requirements for taser use, and therefore Sheriff Simmons had "constructive

Moreover, Sheriff Simmons cannot be held liable for negligently supervising Deputy Bandurski, who allegedly falsified a Use of Force report, because Bailey has not claimed any tort stemming from the alleged falsification. *See Hardy*, 907 So. 2d at 661 (a negligent supervision claim requires a connection between "the employee's employment history and *the current tort committed* by the employee." (emphasis added)); *Cendan v. Sch. Bd. of Broward Cnty., Fla*, 628 F. Supp. 3d 1191, 1219 (S.D. Fla. 2022) ("We thus refuse to consider a negligent-supervision claim that's premised on two (alleged) torts Cendan never bothered to mention in her complaint. And, without these two torts (of course), Cendan's negligent-supervision claim fails."). Likewise here, Bailey's negligent supervision claim fails.

Accordingly, Defendants' Motion to Dismiss, ECF No. 25, is **GRANTED**, and the Clerk is directed to enter judgment accordingly and close the file.

**DONE AND ORDERED** this 30th day of March 2026.

*M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

notice of the need for closer supervision." ECF No. 31 at 14. Yet any purported constructive notice, as Bailey argues, would relate to the need to more closely supervise for taser use. But Bailey's negligent supervision claim is premised on Deputy Bandurski falsifying a Use of Force report, which is entirely independent from taser use.

CASE NO. 3:25-cv-173-MCR-HTC